UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

**VIRGINIA ANIMAL OWNERS ALLIANCE,**
**RHIANNAN VITIELLO,**
**CASSY NEWELL-REED, IRINA BARRETT,**
**NAJEH ABEDELJALIL, CASEY ABEDELJALIL,**
**MICHAEL WILKERSON, and VICKIE MARINO**

          Plaintiffs                    CAFN:
                                            **JURY TRIAL DEMANDED**

      **v.**

**K. MICHELLE WELCH,** in her individual and official capacity
as Senior Assistant Attorney General for the State of Virginia,
**AMY K. TAYLOR,** in her individual and official capacity
as investigator for the Office of the Attorney General,
**RICHARD SAMUELS**, in his individual capacity
as agent of Spotsylvania animal control and deputy of
Spotsylvania County Sheriff Office,
**WILLIAM TYDINGS**, in his individual and official
capacity as Warden of Spotsylvania animal control,
**ROGER L. HARRIS,** Sheriff of Spotsylvania County
in his individual and official capacity,
**ALAN M. JONES**, Sheriff of Charles City
County Virginia, in his individual and official capacity,
**JEFF WALTON**, Sheriff of King William County
Virginia, in his individual and official capacity,
**KRISTINE BOWLES,** Warden of King William
County Animal control, in her individual and official capacity,
**JEREMY A. FALLS,** Sheriff of Fauquier County
Virginia, in his individual and official capacity,
**AARON VESCOVI**, Head of animal control for Fauquier County,
in his individual and official capacity,
**FRED S. CLARK**, Sheriff of Halifax County
Virginia, in his individual and official capacity,
**CATHERINE MARTINETTE,** Chief Animal Warden of Halifax
County Animal Control, her individual and official capacity,
**ROBERT JONES**, Sheriff of Nottoway County in his

individual and official capacity,

     Defendants.

## **PLAINTIFFS' COMPLAINT**

Plaintiffs, Virginia Animal Owners Alliance, Rhiannan Vitiello, Cassy Newell-Reed, Irina Barrett, Najeh Abedeljalil, Casey Abedeljalil, Michael Wilkerson, Vickie Marino, by and through their undersigned attorneys, bring this complaint against the above-named Defendants and in support thereof allege the following:

## **Introduction**

This case is about an overzealous prosecutor, who is using the vagueness and overbreadth of an animal welfare statute, to justify searches and seizures based on an eye test—from a distance—claiming that animals, such as horses, appear "too thin." The statute is being abused for the dual purpose of seizing animals pursuant to civil forfeiture proceedings, while also criminally charging the Plaintiffs, and others, with outlandish initial charges, many of which are immediately reduced, and even then, these reduced charges are many times completely dismissed. The results: owners/caretakers easily beat the criminal charges; however, their animals are never returned to them, or the civil forfeiture is defeated yet criminal charges stand, or both the civil forfeiture and criminal charges are beaten, yet none of the animals are returned. The variety of ways that this statute is unlawful/unconstitutional is

countless, showing zero respect for the due process rights of property (animal) owners.

The ringleader is Defendant Welch, who is fanatical in her approach to pursuing the statutes at issue. Failing to recognize that animal welfare is at the heart of each Plaintiffs' concerns for their animals, Welch uses a scorch-the-earth, by all means necessary approach, to unlawfully seize animals based on grafting new and unthinkable definitions onto the terms used in the statutes at issue—to the detriment of not only the constitutional rights of the Plaintiffs but also to those of the actual owners of many of the animals at issue. For example, people such as Welch, who are versed in civil forfeiture proceedings, know full well about the innocent owner defense. No such defense applies for Welch under the statute at issue: Welch takes the animals who are in the custody of caretakers and never provides notice to the actual owners to provide them an opportunity to get their animal returned to them.

Welch is using this statute as a testing ground with respect to just how far she can stretch the term neglect, and during this process, she is ruining the lives of people who have committed no crime, nor have neglected/abused any animal. Consequently, the Plaintiffs have brought suit to stop Defendants and other similar situated person from violating Plaintiffs' constitutional rights by searching and seizing animals without search warrants nor probable cause, and by filing criminal charges with zero probable cause.

## The statute, and some of its parts, at issue

In this action under 42 U.S.C. § 1983, Plaintiffs seeks a declaration that Va. Code Ann. § 3.2-6507, § 3.2-6568, § 3.2-6569, and § 3.2-6570 violate the Fourteenth Amendment to the United States Constitution. Plaintiffs allege that § 3.2-6507 is unconstitutional for failure to, inter alia, provide due process to animal owners because Va. Code Ann. § 3.2-6507 fails to establish the criteria that must be met before declaring that an owner cannot be immediately located prior to the state euthanizing an animal.

Plaintiffs allege that §§ 3.2-6568, 3.2-6569 and  is impermissibly vague as to, inter alia, and thus permits the spontaneous seizure of animals based on uneducated "eyeing" of an animal, to guess said animal's health status, and based on wild accusations of animal torture, accusations that are easily dispensed of by a cursory inquiry into relevant facts, facts that would have easily been evidenced at a **pre** deprivation due process hearing.

In addition, § 3.2-6569 is unconstitutional because, under subsection (F), it authorizes local governments to euthanize animals after a finding is made by a trial court, but an appeal of the trial court decision is not allowed unless an owner pays a bond. The statute **does not** consider the owner's ability to pay or whether the owner is found guilty; instead, an appeal bond is set, for example, as high as $300,000 and the full amount is demanded by the state, in cash, allegedly to defray costs for the

State's care of unlawfully seized animals—this conduct violates, inter alia, the excessive fine clause of the U.S. Constitution while also denying a meaningful right to appeal.

Moreover, § 3.2-6570, Cruelty to animals' penalty, actually can put a lifetime ban on an owner with respect to the possession of companion animals, a reality that makes pre-property (animal) deprivation hearing even more constitutionally mandated. This penalty is compounded by the fact that what constitute "cruelty to animals" is grossly vague and thus gives an unrestricted delegation of power to law enforcement officers to define in their minds what conduct violates the statute a result that has led law enforcement official to spontaneously challenge admitted, standard husbandry practices as illegal when an entire industry has engaged in said practice as lawful and had no reason to think otherwise until arrested and or animal's seized.

Based on the above, and more, the Plaintiffs seek a declaratory judgment that Va. Code Ann. § 3.2-6507, § 3.2-6568, § 3.2-6569, and § 3.2-6570 are unconstitutional for failure to provide due process and that the state of Virginia, through Defendant Senior Assistant Attorney General, K. Michelle Welch, in her individual and official capacity, and other Defendants, be enjoined from enforcing the statutes.

## JURISDICTION AND VENUE

### 1.

Jurisdiction of this court is based on federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

### 2.

Venue is proper under 28 U.S.C. § 1391(b) because certain of the Defendants, who are sued in their official capacities, carry out their official duties at offices located in this District.

## PARTIES

### 3.

Plaintiff Virginia Animal Owners Alliance (hereinafter, "VAOA" "Alliance") is an organization composed of zoo owners, farm owners, and pet owners.

### 4.

The Virginia Animal Owners Alliance's purpose is to promote and preserve animal ownership in the Commonwealth. Alliance members work at both the legislative and regulatory levels to encourage transparency and accountability of the agencies that govern animal owners in the Commonwealth.

### 5.

They also work to educate lawmakers and state regulators to the realities of animal ownership and how the decisions made in Richmond affect everyday citizens

and the animals in their care. The VAOA works to educate the public through the Facebook page, Alliance website, and local newspaper ads. They advocate for ownership rights – especially the right of equal treatment under the law. Unfortunately, under the challenged statutes, Alliance members are treated as though they operate criminal enterprises.

**6.**

Plaintiff Rhiannan Vitiello is a United States citizen and a citizen of the state of Virginia. At all times relevant to this Complaint, Ms. Vitiello was the caretaker of her family's farm in Charles City County, Virginia and is a registered member of the Virginia Animal Owners Alliance.

**7.**

Plaintiff Cassy Newell-Reed is a United States citizen and a citizen of the state of Virginia. At all times relevant to this Complaint, Ms. Newell-Reed was the owner of a farm in Aylett in King William County, Virginia and is a registered member of the VAOA.

**8.**

Plaintiff Irina Barrett is a United States citizen and a citizen of the state of Virginia. At all times relevant to this Complaint, Ms. Barrett was the owner of

property in Fauquier County, Virginia and is a registered member of the VAOA. Ms. Barret was not the owner of many animals seized as described in this Complaint.

**9.**

Plaintiff Najeh Abedeljalil is a United States citizen and a citizen of the State of Virginia. At all times relevant to this Complaint, Mr. Abedeljalil owned and operated a retail pet store in Halifax County, Virginia, and is a registered member of the VAOA.

**10.**

Plaintiff Casey Abedeljalil is the brother of Najeh Abedeljalil and a citizen of the State of Virginia and of the United States. Casey Abedeljalil is a registered member of the VAOA.

**11.**

Plaintiff Michael Wilkerson is a United States citizen and a citizen of the State of Virginia, and at all times relevant to this Complaint, Mr. Wilkerson resided in Halifax County, VA. Mr. Wilkerson is a registered member of the VAOA.

**12.**

Plaintiff Vickie Marino is a U.S. citizen and a citizen of the State of Virginia, and at all times relevant to this Complaint, she was the owner of the subject farm located in Halifax County, VA. Ms. Marino is a registered member of the VAOA.

**13.**

Defendant K. Michelle Welch works for the Attorney General of Virginia, as a lawyer, and is the director of the Animal Law Unit (ALU), a Unit that works with county officials, including Sheriffs and Animal Control Wardens to enforce the statutes at issue in this case. Ms. Welch is a zealot when it comes to pursuing the statutes at question in this case and has simply crossed the line with respect to the taking of animals and the simultaneous pursuit of criminal charges against relevant Plaintiffs, inter alia.

**14.**

Defendant Amy K. Taylor works as an investigator for the Animal Law Unit and has actively participated in the search and seizure of animals belonging in connection with at least two Plaintiffs in this case.

**15.**

Defendant Richard Samuels is an Agent for the Spotsylvania Animal Control and Deputy of Spotsylvania County Sheriffs Office in Virginia. As Agent and Deputy, Mr. Samuels has the authority to seek search warrants and indeed did so with respect to at least one Plaintiff in this case.

**16.**

Defendant William Tydings is a Warden for the Spotsylvania Animal Control in Virginia. As Warden, Mr. Tydings has had full knowledge of search and seizures

discussed in this Complaint and has authorized relevant, said search and seizures by authorizing his agents such Richard Samuels to provide information for said search and seizures.

## 17.

Defendant Roger L. Harris is the Sheriff for Spotsylvania County, Virginia. As Sheriff, Mr. Harris has had full knowledge of search and seizures discussed in this Complaint and has authorized relevant, said search and seizures.

## 18.

Defendant Alan M. Jones is the Sheriff for Charles City County, Virginia. As Sheriff, Mr. Jones has the authority to search and seize animals under § 3.2-6568 and §3.2-6569. He is sued in his official capacity.

## 19.

Defendant Jeff S. Walton is the Sheriff for King William County, Virginia. As Sheriff, Mr. Walton has the authority to search and seize animals under § 3.2-6568 and §3.2-6569. He is sued in his official capacity.

## 20.

Defendant Kristine Bowles is the Warden of King Williams County Animal Control in Virigina. As Warden, Ms. Bowles has had full knowledge of search and seizures discussed in this Complaint and has authorized relevant, said search and

seizures by authorizing her agents to provide information for said search and seizures.

**21.**

Defendant Jeremy A. Falls is the Sheriff for Fauquier County, Virginia. As Sheriff, Mr. Falls has the authority to search and seize animals under § 3.2-6568 and §3.2-6569. He is sued in his official capacity.

**22.**

Defendant Aaron Vescovi is the Head of Animal Control for Fauquier County. As Head, Mr. Vescovi has had full knowledge of search and seizures discussed in this Complaint and has authorized relevant, said search and seizures by authorizing his agents to provide information for said search and seizures.

**23.**

Defendant Fred S. Clark is the Sheriff for Halifax County, Virginia. As Sheriff, Mr. Clark has the authority to search and seize animals under § 3.2- 6568 and §3.26569. He is sued in his official capacity.

**24.**

Defendant Catherine Martinette is the Chief of Animal Control for Halifax County. As Chief, Ms. Martinette has had full knowledge of search and seizures discussed in this Complaint and has authorized relevant, said search and seizures by authorizing her agent to provide information for said search and seizures.

**25.**

Defendant Robert Jones is the Sheriff for Nottoway County, Virginia. As Sheriff, Mr. Jones has the authority to search and seize animals under § 3.2-6568 and §3.2-6569. He is sued in his official capacity.

## FACTUAL ALLEGATIONS

I.   **Taking of owner's property, without a pre-derivation hearing, based on merely observing what appears to be malnourishment**

### A. The raid on Cassy Newell-Reed's farm

**26.**

Ms. Cassy Newell-Reed has worked with horses for over 30 years; in 2016, Ms. Newell-Reed had horses seized illegally from her farm; significantly, these same horses were later awarded back to her. Ms. Newell-Reed filed a civil suit for damages and thereafter the horses were seized a second time, on January 24, 2019, and thereafter underwent a harrowing experience that culminated with her getting her charges thrown out but never getting her animals back.

**27.**

Deputy Richard Samuels with the Spotslyvania County Sheriff's Office performed surveillance of Ms. Newell-Reed's property on December 26, 2018, and January 19, 2019, and that his surveillance—**done by eyesight alone**-- revealed that Ms. Newell-Reed's horses, were allegedly: "too thin."

**28.**

Everyone, including Deputy Richard Samuels, **failed** to perform a welfare check ahead of time.  The search and seizure was conducted by the Spotslyvania County Sheriff's Office and King William County Sheriff's Office. A total of thirty-three horses were seized and Cassy was charged under the animal fighting statute of 3.2-6571—even though she had never fought an animal in her life.

**29.**

Law enforcement officers never told Ms. Newell-Reed what was wrong with the horses. Again, the warrant, oddly, cited a Virginia statute for animal fighting when in actuality, Ms. Newell-Reed's Horses were allegedly too thin. Again, Ms. Newell Reed has never fought her horses or any other animals.

**30.**

Michelle Welch, of the Attorney General's Animal Law Unit (ALU), assisted in the raid on Ms. Newell-Reed's property; Michelle Welch was present on the property and even personally examined several of the horses.

**31.**

Relevant to the fact that Deputy Samuels sought a search and seizure based on his uneducated, and non-scientifically trained observation of Ms. Newell-Reed's horses allegedly appearing "too thin"—**Defendant Welch uses ill-defined terms in the statute in an arbitrary and capricious manner to justify the seizure.** That is

of no surprise because Defendant Welch **has advised** her staff that the term "ill-treats" may be defined **very broadly** under Section 3.2-6570(A)(i), and that she personally has convicted ten (10) people using an expansive definition of the term.

**32.**

In total, law enforcement seized thirty-three horses from Ms. Newell-Reed.

**33.**

On February 12, 2019, Ms. Newell-Reed's animals were taken from her in a civil forfeiture hearing held in King William General District Court; Defendant Welch prosecuted the seizure hearing.

**34.**

Ms. Newell-Reed was told that she had to pay a $50,000 bond to appeal the civil forfeiture decision. The $50,000 bond was to cover the care of thirty- three horses for nine months at $20 a day and for the $9,900 the county had already expended on care.

**35.**

Ms. Newell-Reed was unable to afford the subject $50,000 bond and thus could not appeal the seizure of her animals.

**36.**

A year later, Ms. Newell-Reed was indicted on three counts of animal cruelty.

**37.**

On May 19, 2021, Ms. Newell-Reed got the charges against her **thrown out because she won a Franks hearing and of the evidence against her was thrown out**. The horses, however, were not returned to her. She continues to own animals.

### B. A man is convicted, then that conviction is partially overturned, then receives a lifetime ban—all starting with a mere accusation of animal cruelty

**38.**

Mr. Abedeljalil was the owner of a pet store located in Halifax, Virginia.

**39.**

Animal Control officers conducted a raid of the pet store based on an accusation of a sick iguana and two (2) baby bearded lizards (hatchlings) that were recently delivered from California in a batch of hatchlings had died.

**40.**

Animal Control Officers under the supervision of Amy Taylor of the ALU unlawfully entered the pet store when it was closed and not publicly accessible without a warrant. Ms. Taylor demanded entry to the premises to conduct a "administrative" search. Two birds, one ferret and four puppies were impounded without good cause.

**41.**

The puppies that were seized had only recently been purchased and had been fully examined by a vet and found to be healthy just days prior to the raid.

**42.**

Mr. Abedeljalil attended a hearing in the General District Court of Halifax County to determine whether he violated state law for neglect and abuse of animals under Section 3.2-6569 and should retain custody of the seized animals.

**43.**

Mr. Abedeljalil demonstrated the puppies were examined by a vet only days prior to the seizure and found to be healthy. The District Court ruled that two (2) puppies and the ferret must be returned to Mr. Abedeljalil; but, the Commonwealth appealed. Mr. Abedeljalil was eventually banned for life from owning companion animals.

**44.**

On appeal, the Circuit Court ultimately ruled for the Commonwealth. Ms. Welch requested the court to impose a $16,000 appeal bond, and then the judge required him to pay a $5,500 appeal bond.  At the request of Ms. Welch, the court also banned Mr. Abedeljalil from owning companion **animals for life.**

**45.**

Just prior to the statute of limitations running, almost one year after the seizure, Mr. Abedeljalil was charged with misdemeanor criminal offenses.  At his trial in August 2022, his defense attorney made a motion to strike all counts.  The Judge granted the motion in regard to the ferret.  Mr. Abedeljalil was found **innocent on five of the other charges** and convicted for three.  During his sentencing, Ms. Welch asked for a ban.  However, she stated she could only ask for one year per charge.  The court noted he was already under a lifetime ban from the Circuit Court.

### 1. Mr. Abedeljalil's sheep are taken in violation of his freedom of religion rights because his sheep "appeared" too thin.

**46.**

For religious purposes, Mr. Abedeljalil raised approximately 15 sheep, on his farm, to be slaughtered according to the dietary prescriptions of his religious faith, Islam; but, in early June, 2022, 15 sheep that were being raised on Mr. Abedeljalil's farm were also seized following a search of his property.

**47.**

Relevantly, the Animal Control officer justified the search and seizure, claiming that the sheep allegedly **appeared** malnourished and lacked food or water. In fact, the sheep were grazing in a green pasture and 24 rolls of hay were clearly visible in an adjoining field. The search warrant lacked these vital facts.

The sheep were seized without consulting the State Veterinarian, as is required by statute for farm animals.  Mr. Abedeljalil **continues to fight** for his innocence.

### 2. During the Pet Store raid, a Macaw was seized and never returned, even though Casey Abedeljalil proved his innocence.

### 48.

A bird seized during the raid of Najeh Abedeljalil's pet store, a mature macaw, was the property of Casey Abedeljalil. Casey Abedeljalil purchased the bird approximately 2 ½ weeks prior to the raid. The bird was delivered to Casey Abedeljalil with a condition known as "cross-beak," which could cause difficulty in feeding unless the bird's beak is routinely trimmed.

### 49.

The subject bird was in the pet store to be monitored because following its delivery Casey Abedeljalil could not get a vet appointment due to the pandemic.

### 50.

While Casey Abedeljalil awaited a vet appointment for the macaw, it was seized without warrant or legal cause during the subject pet store raid; once Casey Abedeljalil was dismissed from the civil forfeiture case, criminal charges were filed against him, and he was arrested. The macaw was never returned to Casey Abedeljalil, even though it was established that the bird's beak needed to only be trimmed by a vet.

**51.**

Significantly, Casey Abedeljalil **won** his case against the Commonwealth, but the macaw was **never** returned to him.  **He continues to own animals and fears the statutes will be used against him**.

### C. Again, animals searched and seized based on what appears to be malnourished horses

**52.**

Rhiannan Vitiello, a resident of Nottoway County, Virginia, was a third generation horse breeder, trainer, and owner. She has also faced harassment from Charles City animal control authorities.

**53.**

On February 22, 2016, local and state authorities raided her family farm at 9500 Sturgeon Point Road, known as "Hidden Hollow." Charles City animal control officer ("ACO") Brandy Colgin alleged that **she observed what appeared to be malnourished horses and no hay for feed in the fields**; no testing was done of the horses prior to their taking, and no pre-takings hearing occurred. A warrant was issued based on the officer's "reasonable cause" to believe a violation may have occurred, pursuant to § 3.2 -6568.

**54.**

Ms. Vitiello 's horses were seized and impounded in a civil forfeiture hearing under § 3.2 -6569.

**55.**

Ms. Vitiello has used Hidden Hollow for clients who board horses there. She provided lessons, training, evaluations, and consignment services to horse owners, as well as therapy riding for mentally or physically disadvantaged individuals. Ms. Vitiello has worked as a breeder.

**56.**

During the raid, Ms. Vitiello was detained in a patrol car for up to twelve hours.

**57.**

During the raid, one of Ms. Vitiello's horses was suffering from colic and began to show obvious signs of distress around noon. During the twelve-hour raid Ms. Vitiello was unable to provide treatment to the horse because she was detained in a patrol car.

**58.**

Ms. Vitiello has experience in animal husbandry and can provide medical care for equines in most major medical situations.

**59.**

Ms. Vitiello requested that she be permitted to call her veterinarian who could come to the farm and provide care to the horse suffering from colic.

**60.**

Animal control officer Colgin never called Ms. Vitiello's veterinarian to attend to the horse suffering from colic.

**61.**

There were four veterinarians at the scene—a Dr. Robert Lee, Dr. Abby Sage, Dr. Jody Collins, and Dr. Stacy Grovell. These veterinarians ignored the horse that was suffering from colic.

**62.**

These four veterinarians later testified at Ms. Vitiello's criminal trial.

**63.**

None of the veterinarians met the statutory requirements under § 3.2-6569 (A) or (B) to order the seizure of the horses.

**64.**

For example, Dr. Collins acted as the lead veterinarian, but she was not an equine expert and therefore, under the statute, she lacked the ability to make the decisions.

**65.**

Relevant to vets being on the scene and not meeting statutory requirements, Ms. Welch is involved with the training of State veterinarians, so there is no excuse not to have veterinarians who meet state requirements on the scene of these unlawful

search and seizures.

**66.**

In fact, Ms. Welch has also advised, "...I teach at those two different law schools in Virginia, and I often will have a mock trial as part of their grade. And so I basically every time I get a new state vet or a new vet and hasn't had a lot of courtroom experience. I get them to come and be the vet in the mock trial because you know, it gives them experience on how to testify and what the questions might be and its low risk."

**67.**

Additionally, an anti-inflammatory painkiller was administered to the horse suffering from colic. But by then it was too late. The horse collapsed, twisted a gut, which caused the intestines to lose arterial supply and become necrotic, it suffered tissue damage due to blood deprivation and finally sepsis set in. Dr. Lee **euthanized** the horse at approximately 9 pm, and in this respect we must be mindful, and again, that Ms. Welch has expressed her comfort with the state euthanizing animals: "If you have any of the things in my cruelty code that you did… and the dog lives, it's only a Class I misdemeanor. The dog has to die or has to be euthanized (and it's a dog or a cat) for me to actually charge you with a felony." In fact, Ms. Vitiello was **charged with a felony** for starving the horse to death.

**68.**

In March 2016, law enforcement officials dug up an old compost pile that was thirty years old or more. They dug up old bones of animals that had died on the farm.

**69.**

The warrant to dig up the compost pile was signed by Sgt. Green.

**70.**

Based on horse bones recovered from the compost pile, the district attorney brought additional charges for animal cruelty, arguing that bone marrow from the bones revealed that at the time when the animals passed away, they were malnourished.

**71.**

Twenty horses were seized from Ms. Vitiello's farm. Law enforcement also seized Ms. Vitiello's cell phone. Another unlawful search and seizure was triggered at a second family farm in Nottoway County. Less than ten days later, in March of 2016, Ms. Vitiello's horses were declared to be the property of the county in a civil forfeiture hearing.

**72.**

The ten-day interval made it difficult for Ms. Vitiello to find legal counsel, conduct the legal research necessary to defend herself, or to subpoena witnesses or

send out FOIA requests to support her defense.

**73.**

In April of 2016, ACO Colgin was fired from her position with Charles City County for allegedly conducting county business without authorization.

**74.**

On May 1, 2016, Ms. Vitiello was arrested and indicted under §3.2-6570 with twenty-three misdemeanor animal cruelty charges and two felonies. Her bond was placed at $15,000.

**75.**

On April 5, 2017, Ms. Vitiello was tried in Charles City Circuit Court. Ms. Vitiello was prosecuted by Michelle Welch of the ALU.

**76.**

As a result of Ms. Vitiello's prosecution by Michelle Welch, Ms. Vitiello is prohibited from owning horses for a period of ten years. Therefore, Ms. Vitiello continues to suffer an ongoing harm.  Ms. Vitiello continues to own other types of animals.

### D. The unsettling and irrational raid on Irina Barrett's home due to her prized Doberman accidently swallowing an object

**77.**

Irina Barrett raised championship quality Dobermans since 2009 in Fauquier County.  She operated a professionally built and licensed kennel on property

surrounding her home. Ms. Barrett's Dobermans have won prizes in competitive shows across the nation and internationally and are in homes around the world.

**78.**

On January 14, 2020, Ms. Barrett rushed a Doberman puppy named Yeva to a veterinary clinic in Maryland as she appeared to be ill. Following inconclusive x-ray imaging, exploratory surgery revealed that Yeva had swallowed a piece of plastic that had ruptured her intestines – a common enough occurrence with dogs of any breed. Emergency measures were taken to repair the damage to Yeva intestines. Unfortunately, Yeva did not recover and died following six days of treatment. Ms. Barrett checked on Yeva throughout this ordeal.

**79.**

Within a week of Yeva's death, and without any reasonable investigation or probable cause, Ms. Barrett's property was raided by Sheriff Deputies and Animal Control Officers. Ms. Barrett's Dobermans were loaded onto trucks and hauled away. Ms. Barrett was handcuffed and detained. She was informed at the scene that she was under arrest for cruelty to Yeva.

**80.**

Law enforcement officers seized many animals, including many dogs which were not owned by Ms. Barrett; she was merely boarding these dogs for their rightful owner, as well as caring for other animals with respect to their rightful

owners.

**81.**

The search of Ms. Barrett's property and the seizure of her animals, and animals owned by people other than Ms. Barrett, and other property (i.e, business and veterinary records) under § 3.2 -6568 and § 3.2-6569 were undertaken without probable cause or legal justification of any kind. Ms. Barrett's home was stripped of family laptops and phones. The equipment was eventually returned. However, all of the doors to Ms. Barrett's home were broken in, and the entire 4,000 square foot home was turned upside down. Bags of dog food were opened and dumped on the floor. Trash bags were ripped open and dumped and dog medicines were strewn about the floor.

**82.**

Ms. Barrett has been arrested on three occasions and is still facing criminal charges for animal cruelty. Commonwealth prosecutors at one point offered to drop all criminal charges if Ms. Barrett would agree to permanently surrender her animals, which was legally impossible because she was not the rightful owner of many of the seized animals. As such, and for many reasons, including her innocence, she refused the offer and continues to fight for her innocence. Her rights as an animal owner, and as a caretaker for other animal owners, have not been terminated and she is allowed to maintain a certain number of animals based

on zoning and acreage.

### E. Outrageous felony torture charges eventually kicked.

### 83.

Ms. Debbie Coley's dog, Romeo, a beloved house pet, was severely injured in an automobile accident. Romeo was immediately treated by a local vet who found his hind legs to be paralyzed. It was hoped this was a temporary condition. Romeo lost control of his bladder and was eventually placed in a wheelchair. Ms. Coley has filed a federal lawsuit based on malicious prosecution, which explains her situation in greater detail.

### 84.

Ms. Coley cared for Romeo at home for as long as possible. The dog required several baths a day and near constant attention. Unfortunately, Romeo's condition did not improve, and it was eventually recommended that she put him under the care of an animal rescue operation in Draper, Virginia, which specialized in special needs animals.

### 85.

On December 23, 2020, Ms. Coley received a call from Sharon Dauley and Animal Control Officer for Wythe County, Virginia, and was advised that Romeo was euthanized less than one week after being placed with the rescue operation in Draper. The following day, December 24, Ms. Coley was arrested and charged with

Felony Torture of an Animal (Va. Code Section 3.2- 6670).7.

**86.**

**Debbie won her case against the Commonwealth**. She continues to own animals and fears Virginia statutes will be used against her.

II.     **On top of violating constitutional rights based on an uneducated eye test, animals have been seized on even more unconstitutional and unethical grounds**

**87.**

Old and special needs animals are a liability to citizens; Citizens attempting to rescue an animal that is less than perfect health puts a citizen at risk of prosecution under Virginia's vague and unconstitutional law. For example, Michelle Welch, ALU's Director, earned a reputation for overzealous prosecution even before formation of ALU; Ms. Welch prosecuted Paula "Poo" Wyche, a member of the board of the Roanoke Valley SPCA, for cruelty to animals when she tried to help a stray dog.

**88.**

The stray dog at issue had a skin condition and dental issues. Michelle Welch is reported to have stated, "all [Ms. Wyche] had to do was euthanize this dog and she'd be OK."

**89.**

The court in the case about the subject stray dog commented--while acquitting Ms. Wyche-- that "any citizen of the Commonwealth can be prosecuted" in spite of doing their best to look after an animal. Nevertheless, Ms. Welch and the ALU continue to prosecute citizens of this Commonwealth for neglect without adequate investigation or basis in fact, **and science**.

**90.**

Another example of Welch criminalizing known standard practices through taking advantage of this vague and unconstitutional statute that she interested as she sees fit at any government is the investigation Tyson breeder.

**91.**

The subject investigation led to prosecutorial overreach where a farm employee is video recorded modifying the beaks of male birds. This is a common practice at broiler farms where a piece of plastic is inserted through the nostrils of a male bird to limit them from eating food intended for female birds. It is known as "boning." Michelle Welch on her own initiative has declared the practice to be animal cruelty strictly on the basis of the broad authority with which she believes to be endowed. Welch stated, "I'm really proud, because **we took a chance on the boning**. Because I looked at it and **I know it's a standard animal husbandry practice**, but I think it's cruel . . . I'm standing the ground. I think that's cruel and

it's my choice, right? Cause I'm indicting." This displays a real problem that needs to be addressed by this Court, when a statute is so vague it criminalizes known standard and accepted practices in an industry, practices thought to be lawful until Welch says they are illegal, by "taking a chance."

**92.**

Additionally, Ms. Welch uses water to criminally charge citizens even when the animals in question are healthy and hydrated; the water bowl/water trough is often the mechanism by which a search warrant is first obtained.

**93.**

In fact, her experts have defined "potable water" for animal consumption as water fit for human consumption; and, under Ms. Welch's interpretation of the Animal Welfare statutes, water for animal consumption must be potable at all times. From a practical standpoint, it is impossible to water animals under this standard. Animals often contaminate their water, lay in their water, turn over their water features, etc. If the animals are housed outdoors, birds and other wildlife are also attracted to the water features and contaminate them as well. Keeping clean water available is a constant challenge for animal owners and using the law in this manner ignores the reality of animal ownership. It is leading to the entrapment and criminalization of good citizens. Subsequently, citizens experience a termination of their rights. Ms. Welch is unrestrained in her

prosecutions and seeks lifetime ownership bans.

**94.**

Additionally, science tells us that disease is a natural occurrence, and it cannot always be prevented even with the best of veterinary care.

**95.**

Ms. Welch views the presence of parasites in an animal to be a sign of neglect and sole justification for criminal prosecution and civil forfeiture.

**96.**

Ms. Welch and her experts also use an animal's imperfections, such as feather plucking, to justify the confiscations of animals—even when the animal does not radically improve in the care of her experts.

**III. Setting appeal bonds at astronomical sums—and seeking full payment--to stop persons of meager means from potentially seeking justice on appeal**

**97.**

**As stated above,** Ms. Newell-Reed was told that she had to pay a $50,000 bond to appeal the civil forfeiture decision. The $50,000 bond was to cover the care of thirty- three horses for nine months at $20 a day and for the $9,900 the county had already expended on care.

**98.**

Ms. Newell-Reed was unable to afford the bond and thus could not appeal the

seizure of her animals.

## 99.

A year later, Ms. Newell-Reed was indicted on three counts of animal cruelty.

## 100.

On May 19, 2021, Ms. Newell-Reed got the charges against her thrown out because she won a Franks hearing and of the evidence against her was thrown out. The horses, however, were not returned to her. She continues to own animals.

### F. Welch insist on a full payment of $300,000 to negate an appeal.

## 101.

In Fall 2019, the ALU claimed credit for investigating and achieving an indictment against Keith A. Wilson, the owner of Wilson's Wild Animal Park, by a grand jury in Frederick County.

## 102.

In the Wilson case, Michelle Welch was appointed special prosecutor and handled the prosecution for the civil seizure and impoundment of the animals.

## 103.

Mr. Wilson's appeal bond was set at $300,000 in General District Court. Ms. Welch asked that it be paid in cash and the Judge ruled accordingly. Mr. Wilson did not have the funds necessary to appeal.

**104.**

A press release by the Attorney General's office claimed that the "Animal Law Unit secured custody of 119 animals" that were seized from Mr. Wilson's zoo. In fact, only Mr. Wilson's most valuable animals were seized, those of lesser value were left in his possession.  Deputy Richard Samuels swore out his affidavit on August 14, 2019, but it lacked important facts.  When the zoo was raided the following day trucks from across the country were present to take the animals. Deputy Richard Samuels testified from the stand that no representatives from the Humane Society of the United States (HSUS) or People For The Ethical Treatment Of Animals (PETA) were present at the seizure.  A memorandum obtained through a FOIA request proved otherwise.  **Mr. Wilson had passed a federal USDA inspection only a few days prior to the raid**.  His inspection reports were not allowed to be admitted as evidence.

IV.   **Plaintiff further showing of unconstitutional conduct**

**105.**

Michael Wilkerson and Vickie Marino live on a farm in Halifax County, Virginia. Michael works as a horse farrier and truck driver. Vickie is an operating room travel nurse. Their jobs take them away from home multiple days a week, but they had farm hands to care for the animals when they were out of town.

**106.**

In September 2021, Vickie returned home to find Animal Control Officer Laura Midkiff in her driveway, who had walked the farm—without a search warrant-- while no one was home without ever notifying Vickie or Michael.

**107.**

Midkiff told Vickie that she had received a complaint about a blue tick hound being on the property but confirmed that she did not see such a dog in the kennels; Lieutenant Midkiff never mentioned any issues with the animals she observed and even spoke with the farm hand, Richard Powell.

**108.**

Vickie had previously had some animals get loose and was charged for animals at large. However, the charges were dropped. She was required to pay $80.00 in court costs. Livestock got loose again in November 2021 and on January 25, 2022. In both of these instances, authorities never told Vickie or Michael about any concerns they had with the animals.

**109.**

With no search warrant, on February 11, 2022, Halifax Animal Control went to the farm, for over an hour, after receiving a complaint about loose horses, cows, and a donkey; However, no one called Vickie or Michael until **after** they searched the farm.

**110.**

Regarding the areas searched, the pig pen, rabbit huts, goat pen, barnyard dog kennels, and chicken coop cannot be seen from the driveway or front pasture, and it is impossible to see into the chicken coop without going into the chicken coop, so there is no way in the world the officers justified the search based on eyeing some type of alleged violation of the statutes at issue in this case.

**111.**

When Defendant Martinette finally did contact Vickie, she told her about the loose animals as well as finding a squealing pig that had gotten stuck in a cracked/broken board of pig flooring; Defendant Martinette stated that upon her search—at p.m., after animal logically had fed and drank all day-- she discovered some pens had either food or water, and thus Defendant Martinette told Vickie she was seizing a nanny goat with two kids, a baby goat, rabbits, some dogs, and seven puppies.

**112.**

On February 12, 2022, Halifax Animal Control returned to the farm. When authorities produced the search warrant, Michael asked them why they needed a warrant for these animals if they hadn't needed one for the others. They did not answer his question.

**113.**

On February 15, 2022, authorities returned with another search warrant and took more animals. Some of the animals were old, but authorities were uninterested in fact-finding. The young, healthy animals were taken along with the old ones. At one point, one of the men assisting with the seizure asked why they were removing healthy animals.

**114.**

Chief Martinette reported to the press that the animals were taken to a secure location where they were being well-cared for. However, this was not a correct statement. For example, one of the individuals who helped haul the animals away was given a calf which he promptly sold for $300.00.  All of this occurred before Michael and Vickie ever had their seizure hearing.

**115.**

Vickie's livestock had a fair market value of $90,000. The Court ordered that any money made from the sale of the animals was to cover Vickie's fees and recompense her for property loss. To the contrary, the animals were given away to the friends of Halifax Animal Control. Upon information and belief, Amy Taylor's Ring Dog Rescue took some of the livestock.

**116.**

Michael and Vickie have since each been charged with 2 misdemeanors and a felony. It is still unclear which animals were used to orchestrate the charges. The

criminal charges are ongoing.

## V.    An overview of the Alliance

### 117.

The Alliance held its first Animal Ownership Lobby Day on January 22,2020 for animal owners to speak with their legislators about animal ownership issues.

### 118.

Were it not for the actions of the ALU, the members of the Alliance could devote more time and resources to sharing their animals with the general public and educating key influencers in the Commonwealth. Instead, the VAOA has had to divert most of their efforts to defend against the aggressive investigations and prosecutions of the ALU under § 3.2-6568 and § 3.2-6569.

### 119.

Alarmed by the raids and prosecutions of the ALU, carried out pursuant to § 3.2-6568 and § 3.2-6569, the Alliance spent substantial sums on phone bills as it networked with people from across the nation to inform people of how the ALU threatens to take away the Alliance members' beloved animals.

### 120.

Alarmed by enforcement of the statutes at issue by the ALU, on its first Animal Ownership Lobby Day on January 22, 2020, the Alliance met with lawmakers to ask for their vote for House Bill 1416, a bill seeking to strengthen the

due process afforded animal owners under state law.

**121.**

The Alliance also hired an attorney to attend and speak to a subcommittee about HB 1416.

**122.**

When the Alliance had legislation sponsored in the 2020 General Assembly to give animal owners more due process under the law, Michelle Welch appeared before the subcommittee and spoke against it. She told the legislators the "3.2-6569 allows for due process" and that owners "have to have a hearing before anyone can take any animal from any person." However, this is not true and not what is happening to animal owners in the Commonwealth.

**123.**

During the 2022 General Assembly session, the alliance worked on 11 bills. Alliance members stood in support of HB 53, which sought to reform the Code regarding the seizure of animals. The original intent was to give all animal owners more due process under the law. It would have raised the standard from "reasonable cause" to "probable cause"; and removed the precrime language of the current code. Delegate Orrock (who represents parts of Caroline and Spotsylvania counties) was concerned and objected to this language in the House subcommittee. He said that probable cause is a "much higher bar," and he did not want to upset the current

standard practice.  He recommended "...some greater protections to zoo facilities and petting zoos, but not changing it for everybody." The majority of the House subcommittee agreed with Delegate Orrock and stripped the due process language from the bill.  After the bill was heard in the Senate subcommittee, zoo owners were to be included on a stakeholder group and the bill was to be carried over to the following session.  However, the stakeholder group was never formed.

### 124.

Members of the Alliance have traveled to other States to speak about the problems threatening animal ownership. Members of the Alliance have been hosted by the West Virginia Gamebreeders Association and the Kentucky Gamebreeders Association.

### 125.

Members of the Alliance estimate they have spent approximately 500 hours and substantial sums in lobbying and educating lawmakers (including costs for an attorney to attend and speak at a subcommittee hearing).

### 126.

And the Alliance, in addition to the expense of phone calls, has spent approximately 1000 hours on networking, traveling, presenting at meetings, attending court cases, creating handouts and publishing Facebook posts, in the effort to raise awareness to the ALU's actions.

**127.**

In addition, the Alliance has expended substantial sums on legal fees and researching the proposed language for HB 1416 and HB 53— legislation intended to amend the standard required for issuance of a warrant under § 3.2- 6568 and for when animals can be seized and impounded under § 3.2-6569.

**128.**

During the 2023 General Assembly Session, the VAOA helped defeat a variety of anti-ownership legislation including a bill that sought to impose $1,000 per violation per day fines on family-run pet stores. Another bill attempted to add the word "sanitize" to the code in regard to a pet's water bowl and would have to made it illegal for a pet store to allow a puppy to drink from a water bottle if passed. The VAOA also actively opposed a bill that would have made it a crime to declaw your cat, regardless of an owner's health condition.

**129.**

Anti-ownership groups united to target the only elephant in the State and her owners/handlers. As introduced, the bill sought to criminalize common training methods and portrayed elephant keepers in a very negative light. The bill was ultimately amended but continued to try to label Asha the elephant at Natural Bridge Zoo as "dangerous". The bill had strong opposition and did not survive the subcommittee vote. Another piece of legislation attempted to restrict coyote

hunting practices.  The VAOA opposed this bill because coyotes are a threat to both pets and farm animals.

## COUNT I
## DECLARATORY AND INJUNCTIVE RELIEF
## SECTION 1983 VIOLATION OF DUE PROCESS PURSUANT TO THE 14 TH AMENDMENT OF THE U.S. CONSTITUTION
### *(Against all Defendants in their official capacities)*

### 130.

The allegations of the above paragraphs 1 through 129 are re-alleged and incorporated by reference as if fully set forth herein.

### 131.

Virginia Code § 3.2-6568 violates the Plaintiffs' due process rights under the Fourth and Fourteenth Amendments to the United States Constitution. Section 3.2-6568 permits issuance of a warrant to search a citizens private property on the basis of an officer's "reasonable cause" to believe illegal activity may occur at the property. This is a subjective standard that is too expansive and vague to be constitutionally acceptable. On its face and by its use, it falls well below the constitutional standard of probable cause.

### 132.

Virginia Code § 3.2-6569 violates the Plaintiffs' due process rights under the Fourteenth Amendment to the United States Constitution. First, Virginia Code § 3.2-6569 is unconstitutional because it does not offer a pre-deprivation hearing

to owners before their animals are seized. None of the individual Plaintiffs received pre-deprivation hearings before their animals were seized.

**133.**

Second, the post-deprivation hearing that is afforded by § 3.2-6569, offered within ten days of the seizure, fails to meet minimum standards of due process because an owner does not have time to subpoena records and witnesses in his or her defense.

**134.**

Third, § 3.2-6569(E) violates due process by not providing for a meaningful right to appeal. The appellate right is unequal on the basis of poverty as only those owners who can first afford to pay a court-imposed surety bond may appeal. The statute does not consider the owner's ability to pay or whether the owner is found guilty.

**135.**

Fourth, § 3.2-6569 (F) is unconstitutional because it fails to specify that animal owners are entitled to hearings before suffering the irreparable harm of having their animals euthanized.

**136.**

Finally, § 3.2-6569 (A) is unconstitutional because it allows any law enforcement officer to seize and impound any animal that has been "cruelly

treated" but the term is vague and thus gives an unrestricted delegation of power to law enforcement officers to define in their minds what conduct violates the statute.

**137.**

Code § 3.2-6569 also violates the Eighth Amendment's Excessive Fines Clause by permitting localities to require owners to pay a bond to defray costs for the State's care of the animals without considering the owner's ability to pay or whether the owner is found guilty.

Under the statute, "Owner" means any person who: (i) has a right of property in an animal; (ii) keeps or harbors an animal; (iii) has an animal in his care; or (iv) acts as a custodian of an animal; this definition is unconstitutional because it allows for the taking of animals entrusted to caregivers without returning the animals to their actual/lawful owner or providing actual owners with notice to challenge civil forfeiture hearings of their animals. There exist no innocent owner defense under the statute, a defense that is entrenched in civil forfeiture proceedings, for example, dealing with money and property seizures regarding drug distribution.

**138.**

Plaintiffs and other members of the Virginia Animal Owners Alliance continue to live in fear that their beloved animals will be seized and euthanized without receiving due process.

**139.**

Based on the facts incorporated to support this Count, Plaintiffs request that this Court both declare the statute at issue as unconstitutional while also enjoining Defendants from enforcement actions pursuant to said statutes. The harm being caused is ongoing while also causing non-monetary irreparable harm.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully request:

(a) Order summons to be issued for service of process upon all Defendants;

(b) Order that a jury determine all issues not settled by this Court;

(c) Declare that Va. Code Ann. § 3.2-6568 and § 3.2-6569 violate the Fourth and Fourteenth Amendment to the United States Constitution.

(d) Enjoin Defendants, their employees, agents, and successors in office enforcing § 3.2-6568 and § 3.2-6569, as described supra;

(e) Award Plaintiffs costs and attorneys' fees pursuant to 42 U.S.C. § 1988;

(f) That Plaintiffs receive such other and further relief as the Court deems

(g) just and proper.

Respectfully submitted this 11th day of May 2023,

/s/ Mario B. Williams
Mario B. Williams
Va. Bar No. 91955

**HDR, LLC**
44 Broad Street NW Suite 200
Atlanta, GA 30303
P: (404) 254-0442
mwilliams@hdrattorneys.com
Counsel for Plaintiffs